# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                        :
UNITED STATES OF AMERICA                :
                                        :
                                        :     CRIMINAL NO. 01-169-02
        v.                              :     CIVIL NO. 09-1318
                                        :
MARCELLAS HOFFMAN                       :
_____:

## <u>MEMORANDUM</u>

**ROBERT F. KELLY, Sr. J.**                              **OCTOBER 30, 2009**

Presently before this Court is Petitioner, Marcellas Hoffman's ("Hoffman"), *pro se*

Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. **§** 2255 ("§ 2255

Motion").  For the reasons set forth below, this Motion is denied.

## I.     BACKGROUND

On April 18, 2001, Hoffman was indicted on a five-count indictment which included the

following charges:  (1) Count 1- conspiracy, in violation of Title 21, United States Code, Section

846; (2) Count 2- carrying a firearm during and in relation to a drug felony, in violation of Title

18, United States Code, Section 924(c); (3) Count 3- brandishing a firearm during and in relation

to a drug felony, in violation of Title 18,  United States Code, Section 924(c); (4) Count 4-

discharging a firearm during and in relation to a drug felony, in violation of Title 18,  United

States Code, Section 924(c); and (5) Count 5- felon in possession of a firearm, in violation of

Title 18,  United States Code, Section 922(g).  Hoffman pled not guilty to all charges and the

case was scheduled for trial.

Hoffman's trial began on February 25, 2002, and this Court conducted a Rule 404(b)

evidentiary hearing as to whether the Government should be able to introduce evidence of

Hoffman's prior drug transactions with one of the Government's witnesses, Juan Rosado ("Rosado").  This Court denied the Government's motion and precluded the Government from specifically making reference to Hoffman's prior drug deals with Rosado, as those events were not part of the present indictment.  On the second day of trial, this Court determined that the Government's questioning of Rosado allowed jurors to infer that Rosado had previously sold drugs to Hoffman, in violation of our ruling excluding this evidence from trial.  We, therefore, granted Hoffman's motion for a mistrial.

On March 6, 2003, the federal grand jury returned a Second Superseding Indictment against Hoffman charging him with conspiracy to distribute and to possess with intent to distribute in excess of 100 grams of heroin and in excess of 500 grams of cocaine, in violation of Title 21, United States Code, Section 846 (Count One); attempting to possess with intent to distribute in excess of 100 grams, that is approximately 390 grams of heroin, in violation of Title 21, United States Code, Section 846 (Count Two); use and carrying of a firearm during and in relation to a drug trafficking offense, in violation of Title 18, United States Code, Section 924(c)(1)(A) (Count Three); conspiracy to commit robbery affecting interstate commerce, in violation of Title 18, United States Code, Sections 1951(b)(1) and (b)(3) (Count Four); using and carrying a firearm during and in relation to a crime of violence, in violation of Title 18, United States Code, Section 924(c) (Count Five); and felon-in-possession of a firearm, in violation of Title 18, United States Code, Sections 922(g) and 924(e) (Count Six).

The retrial was held from October 7 through October 10, 2003, and Hoffman was convicted on all counts.  The evidence at trial established that Rosado ran a multi-million dollar drug organization distributing cocaine and heroin in Philadelphia and the surrounding areas.

Hoffman was one of Rosado's distributors.  Hoffman began purchasing heroin and cocaine from Rosado in the summer of 2000.  At the first drug sale, Hoffman bought 250 grams of cocaine for $7,000, paying cash for half the drugs and taking the other half on consignment.  A few days later Hoffman told Rosado that he had "finished with the drugs" and that he wished to purchase more. (N.T. Oct. 7, 2003 at 58.)  At this second meeting, Hoffman brought the $3,500 due for the drugs he had purchased on consignment and an additional $7,000 to buy more drugs.  At a later meeting, Hoffman informed Rosado that "he could get rid of a truckload of drugs in Virginia and that he just needed somebody that could supply him with good quantities and good price."  (Id. at 59.)  Hoffman thereafter bought narcotics from Rosado on many occasions for sale in Virginia.

In early 2001, Hoffman decided to rob Rosado and enlisted the help of a former co-worker, Gary Oliver ("Oliver").  Hoffman telephoned Rosado and told him that he was coming to Philadelphia with $30,000 to purchase 500 grams of heroin and a kilogram of cocaine.  Oliver testified that on the morning of January 20, 2001, he drove to Hoffman's house to pick him up and that when Hoffman came out of his house he was carrying a "bag with a couple of handguns in it and one of the butts of the guns was hanging out."  (N.T. Oct. 10, 2003 at 10.)  The two men then drove to Camden, New Jersey where they met Hoffman's cousin, Gary McGahee ("McGahee), also known as "Casbah."  The three men then drove to meet Rosado at Porky's Point restaurant.

Rosado picked up 390 grams of heroin for Hoffman, but not the cocaine requested because he had decided he was not ready "to do any more business with [Hoffman]."  (N.T. Oct. 7, 2003 at 61.)  Rosado decided to meet Hoffman at 5911 Frontenac Street, Rosado's stash house.  That evening, Rosado put the heroin in his truck and drove with his wife and mother-in-

3

law to the Frontenac Street house.  He sent David Vasquez ("Vasquez"), one of his employees, to

meet Hoffman at Porky's Point and bring him back to the Frontenac Street house.

Vasquez did so and told Hoffman, Oliver, and McGahee to follow him to Frontenac

Street.  After arriving there, Hoffman gave one gun to Oliver, one to McGahee, and kept one for

himself.  Hoffman and Oliver followed Vasquez into the house while McGahee waited outside.

Rosado had not yet arrived.  Once inside, Hoffman gave Vasquez only $16,000, not the agreed

upon $30,000.  After Vasquez demanded the remaining $14,000, Hoffman and Oliver pointed

their guns at Vasquez, and Hoffman handcuffed him and demanded to know where the drugs and

money were located.  Vasquez answered that Rosado was bringing the drugs, and he was then

thrown on the floor and pistol-whipped by Hoffman, who shot him in the leg.

When Rosado arrived, he met Hoffman and they went to the second floor where Hoffman

pointed a gun at Rosado, showed him a badge, told him he was under arrest, and handcuffed him.

Hoffman then demanded the drugs.  Rosado told him the drugs were in the truck and that he

would get them.  Before they went to the truck, Hoffman searched Rosado and took $1,000 in

cash, his credit cards, and his license.  At some point during this time, Hoffman also took 800 to

900 grams of cocaine from the kitchen.

After exiting the Frontenac Street house, Hoffman placed Rosado in his truck with

McGahee and walked toward Rosado's truck.  Rosado freed himself, jumped out of Hoffman's

truck, and ran toward his own truck.  Hoffman chased Rosado and fired at him, hitting him once

in the buttocks and grazing his leg.  Rosado's wife began driving the truck toward the two men.

Hoffman shot at the truck with Rosado's wife and mother-in-law in it, but ran out of bullets.

Rosado then jumped into the truck and drove away, but Rosado's wife noted the license plate

number of Hoffman's truck.

A short time later, Rosado's truck was pulled over by police.  Rosado informed the police he had been the victim of a shooting and his wife gave the police Hoffman's license plate number.  Based on information received from Rosado, the police then searched the Frontenac Street house, where they discovered Vasquez and Oliver, whom they detained, and recovered drugs, drug paraphernalia, and a loaded firearm.

That evening, a police officer observed Hoffman's truck run a red light in Camden, New Jersey.  The officer pulled Hoffman over and, as he approached, observed Hoffman "making all kind[s] of movements in the vehicle."  (N.T. Oct. 8, 2003 at 78.)  The officer ordered Hoffman to place his hands on the wheel, but Hoffman failed to comply.  The officer then asked for Hoffman's documentation.  Hoffman responded that he had left the documents at a friend's house.  The officer ordered Hoffman to exit the car.  The officer testified that Hoffman became "rambunctious" and began to "push off."  The officer then conducted a pat-down, and felt something in Hoffman's upper left-hand pocket.  The officer shined his flashlight into the pocket and was able to see it was a box of hollow-point ammunition.  After securing Hoffman and McGahee, who was in the truck, the officer performed an inventory search of the truck and found a loaded gun and several credit cards in the name of Roberto Roman, the alias used by Rosado. The officer took Hoffman into custody.

On January 25, 2001, the officer who had arrested Hoffman learned that there may have been an outstanding warrant for Hoffman or his vehicle.  The officer went to the address Hoffman had given him and observed Hoffman on the street.  When Hoffman saw the police he

started to run but was caught and arrested.[1]

On February 17, 2004, this Court sentenced Hoffman to life imprisonment on Counts One, Two, and Six, to run concurrently. On Count Three, Hoffman was sentenced to 10 years, to run consecutively to the life sentences. On Count Four, he was sentenced to two years, to run concurrently with the 10-year sentence, and on Count Five, Hoffman was sentenced to 25 years to run consecutively to the life sentence and 10-year sentence.[2] (N.T. Feb. 17, 2004 at 153.) Hoffman appealed this conviction to the Third Circuit Court of Appeals.[3] In a decision dated September 13, 2005, the Circuit affirmed Hoffman's conviction, but vacated the sentence in light of United States v.Booker, 543 U.S. 220 (2005), which was handed down subsequent to this Court's sentencing. The case was then remanded to this Court for resentencing. See Hoffman, 148 Fed. Appx. at 122.

While the case was on remand to this Court, Hoffman's new counsel filed a Motion for New Trial claiming after-discovered evidence under Federal Rule of Criminal Procedure 33.[4] We denied this Motion on October 24, 2006. On December 11, 2006, we resentenced Hoffman

---

[1]The majority of this factual recitation is taken from the Third Circuit Opinion, United States v. Hoffman, 148 Fed. Appx. 122 (3d Cir. 2005).

[2]All of these sentences were to be followed by a term of eight years supervised release on Counts One and Two, six years supervised release for Counts Three and Five, five years supervised release for Count Six, and three years supervised release for Count Four. (N.T. Feb. 17, 2004 at 153.)

[3]Hoffman raised the following claims on appeal: (1) there was insufficient evidence to support the conviction; (2) the government failed to prove a commerce clause nexus; (3) the conviction subjected him to double jeopardy; (4) Speedy Trial Act violation; and (5) his sentence was unconstitutional in light of United States v. Booker, 543 U.S. 220 (2005).

[4]Hoffman argued that certain phone records admitted in a summary exhibit at his retrial contained errors and were improperly admitted.

to 30 years imprisonment on Counts One, Two, and Six, and 20 years imprisonment on Count

Four.  Also, with respect to Counts Three and Five, we sentenced Hoffman to sentences of 10

years and 25 years, both to run consecutively to any other sentence imposed.  Hoffman then filed

a timely appeal in the Court of Appeals.[5]  On March 28, 2008 that court affirmed the decisions.

See United States v. Hoffman, 271 Fed. Appx. 227 (3d. Cir. 2008).

      Hoffman filed the instant Motion on March 27, 2009, and raised the following

ineffective assistance of counsel claims:[6]

> (1) trial counsel[7] was ineffective for failing to investigate known
> corroborating witnesses;
> (2) trial counsel was ineffective for failing to offer the testimony of
> an inmate witness;
> (3) trial counsel was ineffective for failing to investigate an
> allegedly stolen letter;
> (4) trial counsel was ineffective for failing to investigate
> Government Exhibit 303;
> (5) appellate counsel[8] was ineffective for failing to raise the issue
> of newly discovered evidence;
> (6) trial counsel was ineffective for failing to investigate
> Government Exhibit 205;
> (7) trial counsel was ineffective for failing to investigate the

---

[5]On January 8, 2007, the Court of Appeals consolidated this appeal with an appeal that Hoffman filed from this Court's denial of his Motion for a New Trial.

[6]Along with his § 2255 Motion, Hoffman has filed a 114-page "Memorandum of Law and Points in Support of his Motion," and nearly fifty Exhibits.  It must also be pointed that in this Memorandum, Hoffman has set forth a slew of issues some of which are mixed together and others difficult to interpret.  In considering this Motion, we have identified fourteen issues which we will address, infra.

[7]Ronald Thompson, Esq. ("Thompson") represented Hoffman at his first trial that ended in a mistrial.  L. Felipe Restrepo ("trial counsel"), now a Magistrate Judge in this Court, represented Hoffman at his second trial.

[8]Jack McMahon, Esq. ("sentencing counsel") represented Hoffman in his Motion for a New Trial and at sentencing.

handgun and the handcuffs that were introduced into evidence;
(8) trial counsel was ineffective for failing to argue that the crimes charged did not affect interstate commerce;
(9) trial counsel was ineffective for failing to impeach witness, Detective Andrew Callaghan, with prior testimony;
(10) trial counsel was ineffective for not raising vouching objections;
(11) trial counsel was ineffective for failing to raise an Apprendi issue;
(12) appellate counsel[9] was ineffective for failing to raise a conflict of interest claim on appeal;
(13) appellate counsel was ineffective for failing to litigate a Batson claim on appeal; and
(14) sentencing counsel was ineffective during sentencing and for failure to raise sentencing issues on appeal.

## II.    STANDARDS OF REVIEW

### 1.  Section 2255

Hoffman is entitled to relief only if his custody or sentence violate federal law or the

Constitution.  Section 2255 provides, in pertinent part:

> A prisoner in custody under sentence of a court established by Act of
> Congress claiming the right to be released upon the ground that the
> sentence was imposed in violation of the Constitution or laws of the
> United States, or that the court was without jurisdiction to impose such
> sentence, or that the sentence was in excess of the maximum authorized by
> law, or is otherwise subject to collateral attack, may move the court which
> imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255 (2008).  A district court is given discretion in determining whether to hold an

evidentiary hearing on a habeas petition under § 2255.  See Gov't of the V.I. v. Forte, 865 F.2d

59, 62 (3d Cir. 1989).  In exercising that discretion, the court must first determine whether the

Petitioner's claims, if proven, would entitle him to relief, and then consider whether an

---

[9]Andrew Erba, Esq. ("appellate counsel") represented Hoffman on direct appeal to the Third Circuit.

evidentiary hearing is needed to determine the truth of the allegations.  See Gov't of the V.I. v.

Weatherwax, 20 F.3d 572, 574 (3d Cir. 1994).  Accordingly, a district court may summarily

dismiss a motion brought under § 2255 without a hearing where the "motion, files, and records

'show conclusively that the movant is not entitled to relief.'"  United States v. Nahodil, 36 F.3d

323, 326 (3d Cir. 1994) (quoting United States v. Day, 969 F.2d 39, 41-42 (3d Cir. 1992)).

### 2.  Ineffective Assistance of Counsel

In Strickland v. Washington, the Supreme Court of the United States set forth a two-

prong test for evaluating a claim of ineffective assistance of counsel.  466 U.S. 668 (1984).  A

finding against the Petitioner under either prong is sufficient to find for the government.  United

States v. Ciancaglini, 945 F. Supp. 813, 816 (E.D. Pa. 1996).

First, Petitioner must show that counsel's performance was deficient, meaning that

counsel made errors so serious as to deprive Petitioner of the "counsel" guaranteed by the Sixth

Amendment.  Strickland, 466 U.S. at 687.  This evaluation must be based upon the facts of the

case at the time of counsel's conduct.  Id. at 690.  "[T]he right to effective assistance of counsel

does not guarantee that an attorney will never err."  Diggs v. Owens, 833 F.2d 439, 446 (3d Cir.

1987).  Therefore, to satisfy this prong, Petitioner must show that counsel's performance fell

below an objective standard of reasonableness under the prevailing professional norms.

Strickland, 466 U.S. at 688.  However, "[a]n attorney is presumed to possess skill and knowledge

in sufficient degree to preserve the reliability of the adversarial process and afford his client the

benefit of a fair trial."  Diggs, 833 F.2d at 444-45.  Consequently, great deference is given in

evaluating counsel's performance, and there is a strong presumption that counsel's challenged

actions constitute sound trial strategy.  <u>Strickland</u>, 466 U.S. at 689.

Second, even if the Court finds counsel's conduct to have been deficient, Petitioner must nevertheless show that his defense was prejudiced by the deficient performance in order to justify setting aside the verdict.  <u>United States v. Griffin</u>, No. 91-612, 1993 WL 34927, at *5 (E.D. Pa. Feb. 9, 1993).  To establish the requisite prejudice under this second prong, Petitioner must show that counsel's errors were so serious as to deprive him of a fair trial, i.e., one having a reliable result.  <u>Strickland</u>, 466 U.S. at 694.  In order to do so, Petitioner must establish a reasonable probability that but for counsel's errors, the result of the trial would have been different.  <u>Id.</u>  A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial.  <u>Id.</u>  This second prong must be evaluated by a totality of the circumstances existing at the time of the trial because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."  <u>Griffin</u>, 1993 WL 34927, at *5 (quoting <u>Strickland</u>, 466 U.S. at 696).

## III.    DISCUSSION

### 1.  Failure to Present Alibi Witness[10]

Hoffman asserts that trial counsel was ineffective for failing to investigate and call McGahee as a supposed alibi witness.  (Mot. at 7-13.)  It is surely among the duties of an attorney to investigate the circumstances of an alleged crime.  See <u>United States v. Gray</u>, 878

---

[10]Hoffman first asserts in this ineffectiveness claim that Thompson was ineffective for failing to call McGahee as a witness.  However, any claims against Thompson are not cognizable because the first trial did not end in a guilty verdict, and thus, Hoffman could not have been prejudiced by any alleged deficiencies of counsel.

F.2d 702, 711 (3d Cir. 1989).  Thus, counsel's "decision not to investigate must be directly

assessed for reasonableness."  Strickland, 466 U.S. at 691.  As noted above, McGahee was

Hoffman's co-conspirator who assisted him in carrying out the robberies on January 20, 2001.

McGahee was convicted of participating in the robbery with Hoffman.[11]

> Hoffman has submitted as an Exhibit an affidavit from McGahee which states in part:

>> I was never in the presence of Marcellas Hoffman on January 20,
>> 2001.  I have never robbed nor agreed to rob anyone whatsoever.  I
>> was never contacted by Marcellas Hoffman's attorneys, prior to
>> him starting trial, on October 6, 2003 and if I were called upon, I
>> would have stated the same facts as I have in this said affidavit.  I
>> will testify under oath to these same facts if I were called by any
>> member of Marcellas Hoffman's defense team.

(Mot., Ex. 10.)

> This claim is without merit for several reasons.  First, it is clear that McGahee's affidavit,

in no way, presents an alibi for Hoffman.  Rather, it simply states that McGahee was not "in the

presence of Marcellas Hoffman on January 20, 2001."  It does not place Hoffman elsewhere on

the day of the robbery.  In addition, McGahee's credibility is questionable, at best, because

McGahee is still in the process of attempting to prove his own innocence in the re-trial of the

charges against him.  Courts have repeatedly considered the lack of credibility of a witness in

assessing prejudice.  See, e.g., Cagle v. Branker, 520 F.3d 320, 326-27 (4th Cir. 2008) (finding

---

[11]See McGahee v. United States, 570 F. Supp. 2d 723, 725 (E.D. Pa. 2009).  In that case, the Honorable Ronald Buckwalter granted a § 2255 petition for ineffective assistance of counsel because McGahee's trial counsel completely failed to conduct any investigation concerning three alibi witnesses with whose names he was provided, and counsel knew where two of these witnesses worked.  Id. at 729-37.  It is notable that the Government has filed an appeal of the grant of the § 2255 petition, and that appeal is now pending.  See McGahee v. United States, App. No. 08-3559.

no prejudice because potential witness lacked credibility); <u>Sullivan v. DeLoach</u>, 459 F.3d 1097,

1111 (11th Cir. 2006) (finding no prejudice because the potential witness's "testimony wholly

lacked credibility"); <u>Thompson v. Nagle</u>,118 F.3d 1442, 1453 (11th Cir. 1997) (affirming denial

of habeas corpus petition because potential witnesses, who were not called and who allegedly

would have testified in petitioner's favor at trial, were not believable).

In addition, the record establishes that trial counsel did conduct a diligent investigation to

find McGahee as a potential witness.  Indeed, Hoffman's own Exhibit 11, which contains two

letters written from trial counsel to Hoffman, illustrates such diligence.  In a letter dated August

1, 2003, trial counsel wrote to Hoffman:  "It was good to see you today.  I called the number you

gave me for Casbar [McGahee] but it is not working.  I was able to reach your Aunt Pearle who

knows Casbar and [she] told me that she would have him call me and leave a good number."

(Mot., Ex. 11.)  In another letter dated August 19, 2003, trial counsel wrote to Hoffman:  "Please

note that I tried to reach Casbar as per our agreement today but his number is now disconnected.

I will have Mr. Lee begin to find the witness in question."  (<u>Id.</u>)  Thus, it is apparent that trial

counsel conducted more than a "reasonable investigation" to find McGahee, and the only

conclusion we can reach is that McGahee did not want to talk to trial counsel.  Thus, trial counsel

was not "deficient" under the first prong of <u>Stickland</u>.[12]

## 2.  Failure to Offer Testimony of Inmate Witnesses

Hoffman next argues that trial counsel was ineffective for failing to investigate two

_____

[12]It is also apparent that this is not a case where trial counsel conducted no investigation
as to potential alibi witnesses, as the Court found in McGahee's own § 2255 motion as noted
earlier.  <u>See</u> <u>McGahee</u>, 570 F. Supp. 2d at 723.

inmates at the Federal Detention Center who would have testified that Government witnesses, Oliver and Arthur Boyce ("Boyce"), were lying.  Hoffman has presented declarations of two inmates, Anton Tyler ("Tyler") and Anthony Gagliardi ("Gagliardi").  The declaration of Tyler, dated June 6, 2005, although difficult to understand, seems to state that Tyler had a conversation with another inmate named Ronald Johnson, who in turn, had a conversation with Boyce concerning Boyce's supposed decision to steal some of Hoffman's legal work from his cell. (Mot., Ex. 14.)  Gagliardi's declaration, dated October 11, 2006, states that he had a conversation with Oliver on May 6, 2005 where Oliver supposedly admitted that he had lied in his testimony. (Mot., Ex. 16.)[13]

This claim is clearly without merit because trial counsel cannot be "deficient" under Strickland's first prong for failing to call witnesses who he had no way of knowing existed at the time of the trial.  As noted above, Hoffman's trial took place in October 2003, and Tyler's declaration was given on June 6, 2005.  Gagliardi's declaration was given on October 11, 2006, and he stated that his conversation with Oliver occurred on May 6, 2005.  Thus, trial counsel cannot be deemed ineffective for failing to find and investigate witnesses who did not exist at the time of trial.[14]

_____

[13]Even if this claim were presented as one of newly discovered evidence, it would fail because these declarations are nothing more than impeachment evidence rather than evidence of innocence.  As the Third Circuit has consistently held, the evidence relied upon, among other requirements, "must not be merely cumulative or impeaching."  United States v. Kelly, 539 F.3d 172, 181-82 (3d Cir. 2008).

[14]Moreover, the declarations of Tyler and Gagliardi are hardly reliable.  For example, Tyler's statement amounts to double hearsay because he does not claim to have spoken to Boyce, but to Ronald Johnson.  Similarly, Gagliardi's statement is highly suspect because it fails to include any specific details about what Oliver supposedly lied about, and offers no explanation why Oliver would have confided in Gagliardi.  Thus, even if these statements could form the

### 3. Failure to Investigate a Stolen Letter

Hoffman asserts that trial counsel was ineffective for failing to investigate an alleged

stolen letter which contained attorney-client privileged information.  (Mot. at 21-27.)  Hoffman is

apparently referring to a letter that he wrote to Brett Thomas, Esq. that was allegedly stolen from

his cell by Boyce.  However, Hoffman has offered no details of the contents of such letter or

explained how the alleged stealing of this letter prejudiced his defense.  More importantly,

Hoffman fails to explain what trial counsel was supposed to do with this allegation.  Thus, there

simply is no basis in the record to support an ineffective assistance of counsel claim with regard

to this allegation.[15]

### 4. Failure to Investigate Government Exhibit 303

Hoffman next claims that trial counsel was ineffective for failing to investigate errors in

Exhibit 303 which summarized calls made to and from his cell phone.  At trial, the Government

placed into evidence, without objection, Exhibit 303, which was a computer disk containing the

record of telephone calls made from Hoffman's cell phone, provided by AT&T.  (N.T. Oct. 9,

2003 at 46.)  Detective Callaghan analyzed these records, which were voluminous, and offered

testimony at trial.  For example, from December 22, 2000 to January 25, 2001, there were sixty-

nine pages of calls from Hoffman's cell phone, each page contained thirty to thirty-five calls.  (Id.

at 48.)  Detective Callaghan wanted to isolate the calls from Hoffman's cell phone to "members

---

basis of an ineffective assistance of counsel claim, they could not establish the requisite prejudice
under Strickland's second prong.

[15]It must be noted that trial counsel did address the issue that Boyce may have stolen
Hoffman's legal paperwork from his cell during closing arguments.  (N.T. Oct. 10, 2003 at 204-
05.)

of the Rosado organization." Using a computer, he filtered out all the area codes called from Hoffman's phone with the exception of area codes 215 and 610. (Id.)

The Government agrees that the summary exhibit used by Detective Callaghan contained errors. As a result of an error in transferring the phone numbers from the raw data disk to the summary exhibit, the summary exhibit incorrectly lists that on January 20, 2001 there were fourteen calls to a single phone number: 610-905-4663. As the raw data sets forth in Exhibit 303 however, on January 20, 2001 there were not fourteen calls to this one number. However, there were, in fact, fourteen calls to numbers identified as being associated with the Rosado drug organization. These fourteen calls were made to a variety of different numbers in the 610 and 215 area codes. In other words, the summary exhibit was accurate to the extent that it showed that the defendant's phone was used to make fourteen calls to phone numbers identified as being associated with the Rosado drug organization, but was inaccurate to the extent that it represented that all of the calls were made to a single phone number.

The same type of data transfer error was made with respect to the calls reported for December 26, 2000, and for January 22, 2001 through January 25, 2001. For example, for December 26, 2000, the summary exhibit lists ten phone calls to 610-979-0259. Exhibit 303 confirms that there were ten calls to phone numbers associated with the Rosado organization, but not all ten were made to that single phone number. For January 22, 2001, the summary exhibit incorrectly lists eight calls to 610-979-0259. In fact, as the raw data sets forth in Exhibit 303, there were eight calls to phone numbers identified as being associated with the Rosado drug organization, but they were made to a variety of different numbers and not only to that single number. For January 23, 24 and 25, 2001 the summary exhibit lists 1, 2 and 19 phone calls,

respectively, to 610-979-0259.  Again, Exhibit 303 confirms that on each day, those phone calls were made not to a single phone number, as listed in the summary exhibit, but to phone numbers identified as being associated with the Rosado drug organization.

The instant claim, however, is without merit because it has already been considered and denied by this Court, and affirmed on appeal to the Court of Appeals.  As noted above, Hoffman previously filed a Motion for a New Trial pursuant to Federal Rules of Criminal Procedure 33.[16] In that Motion, Hoffman argued that the above-described inaccuracies in Exhibit 303 constituted "newly discovered evidence" entitling him to a new trial.  Hoffman now raises this same claim in this § 2255 Motion, but as an ineffective assistance of counsel claim.  We denied the Motion for a New Trial and found that Hoffman's argument "[f]ails for the reason that this evidence is at best impeaching material and not of a nature that on re-trial the Defendant would probably be acquitted."  United States v. Hoffman, No. 01-169, 2006 WL 3043107, at *5 (E.D. Pa. Oct. 24, 2006).  The Court of Appeals subsequently affirmed this decision.  See United States v. Hoffman, 271 Fed. Appx. at 227.  In its decision, the court summarized the evidence against Hoffman as follows:

> [T]here was evidence that Rosado ran a large cocaine and heroin
> distribution organization, that Hoffman distributed drugs in
> Virginia, and that Hoffman wanted Rosado to be his source for the
> drugs he sold in Virginia.  There was also evidence of multiple
> drug transactions between the two men at which Hoffman

---

[16]Under Federal Rule of Criminal Procedure 33, one of the five requirements that Hoffman needed to meet to be awarded a new trial on the basis of newly discovered evidence was that the evidence "must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal."  United States v. Cimera, 459 F.3d 453, 458 (3d Cir. 2006) (finding that merely discovering errors in evidence admitted at trial does not constitute new evidence).

16

> purchased large amounts of cocaine and heroin, and evidence of
> trust as shown by the fact that Rosado permitted Hoffman to
> purchase some of the drugs on credit.  Finally, the jury heard
> evidence that Hoffman was aware of other parts of Rosado's drug
> conspiracy, such as where he obtained his drugs and the identities
> of some of the employees he used to distribute them, and that
> Hoffman frequently called Rosado to agree upon drug purchase
> amounts, prices, meeting times, and places.

Id. at 229.  The court explained that "we wrote that description based mostly on face-to-face meetings, including one in which Hoffman informed Rosado that 'he could get rid of a truckload of drugs in Virginia and that he just needed somebody that could supply him with good quantities and good price.'"  Id.  The court concluded that the cell phone calls were just a small part of the numerous contacts between Rosado and Hoffman made with each other, and agreed with our decision that Hoffman's later-obtained cell phone records would not probably produce an acquittal.  Id.

Hoffman has now raised this same issue as an ineffective assistance claim.  However, for the same reasons that it failed in his Motion for a New Trial, it fails under Strickland's second prong which requires Hoffman to "establish a reasonable probability that but for counsel's errors, the result of the trial would have been different."  466 U.S. at 694.  Thus, for the reasons explained by the Third Circuit in its decision, even if trial counsel had committed error in failing to investigate and find the errors in Exhibit 303, the result of Hoffman's trial would not have been different because of the other overwhelming evidence against him.[17]

---

[17]Hoffman also claims that appellate counsel was ineffective for failing to raise on direct appeal the issue of newly discovered evidence with respect to the errors in Exhibit 303.  (Mot. at 95-104.)  For the same reasons that this argument was rejected in the Motion for a New Trial and affirmed by the Third Circuit, as discussed above, this claim is also rejected.

**5. Failure to Investigate Government Exhibit 205**

Hoffman's next ineffective assistance claim is that trial counsel was ineffective for failing to further investigate Government Exhibit 205 despite his request that counsel do so. Exhibit 205 is a Government exhibit showing phone numbers of Hoffman's co-conspirators. Hoffman states in his Motion that:

> Exhibit 205[] was a document that was undated, and allegedly written and prepared by an alleged out-of court coconspirator allegedly name Jackie Jacquelin Merry, who the government elected not to charge her with any crime as a tacit quid pro agreement to keep her off the stand and not subject her to cross-examination, which violated Hoffman's confrontation rights[][18] . . . he would been able to show the Court that Government Exhibit 205[] was nothing more than a stale document that the Government had in its files from the beginning of the case, and the Government did nothing more than just question Rosado about names and numbers that were contained on that document to support Det. Callaghan's false testimony that he further investigated petitioner Hoffman's case.

(Mot. at 50.) Hoffman further states that the Government deliberately used this Exhibit to mislead the Court and jury into believing that the phone numbers contained in it were part of his actual cell phone records. (Id. at 50-51.) Although it is difficult to decipher, as is apparent from

---

[18]This assertion is baseless because the prosecutor stated in her closing argument that this list of phone numbers was taken from a car stop of Miguel Ramos. She stated:

> There's one in particular that I want you to look at when you go back to the jury room for your deliberations, Government Exhibit 205. We also blew that up. You will recall the testimony where this came from? This, the officer from Bensalem testified, came out of a car stop, a car stop in January, January of 2001, in Bensalem, a car stop of Miguel Ramos.

(N.T. Oct. 9, 2003 at 98.)

the above statement, Hoffman seems to be arguing that had trial counsel further investigated this

exhibit, he would have been able to show the jury that the "Government could not have proven

that no phone calls were made in furtherance of the alleged Juan Rosado drug conspiracy." (Mot.

at 51.) This claim, however, fails. Rosado testified at trial that Exhibit 205 contained the phone

numbers of his drug organization, and Detective Callaghan confirmed such based on his

investigations. (N.T. Oct. 10, 2003 at 96-97.) Thus, there is no basis in the record for Hoffman's

assertions that trial counsel should have conducted any kind of further investigation into this

Exhibit, and therefore, any ineffective assistance claim is without merit.

### 6. Failure to Investigate a Handgun and Handcuffs

Hoffman's next ineffective claim is that had trial counsel:

> properly investigated Petitioner's case he would have been able to, (1) use
> Mr. Jesse Walls, and Mr. Gary McGahee, as corroborative witnesses to
> show Petitioner Hoffman did not in fact, provided [sic] Gary Oliver with
> handguns as he so falsely testified, and, (2) shown that Det. Callaghan had
> falsely testified against Petitioner concerning the use of this handgun . . .

(Mot. at 53.) The record contains an affidavit from Jessie Walls ("Walls") dated February 7,

2001. In such, Walls states that on January 20, 2001, he was washing Hoffman's car in Camden,

New Jersey when a car approached and fired gunshots near a place called the Cotton Club. After

the shooting stopped, Walls claims that a man dropped a gun into the street, and that he picked

the gun up with the intention of turning it over to the police. Instead, he states that he "placed the

gun underneath the passenger seat of Mr. Hoffman's truck, and the bullets in a coat in the truck

as well, separate from the gun." (Mot., Ex. 13.) Walls further states that he never told Hoffman

that the gun was under his truck seat because Hoffman told him that he was just taking the truck

over to a McDonald's restaurant and would be right back.  However, he never saw Hoffman

again that day and learned the next day that he had been arrested for possession of the weapon.

(Id.)

Hoffman claims that the facts contained in this affidavit and in McGahee's affidavit

"undermine any reasonable basis for believing Gary Oliver, Juan Rosado, David Vasquez, and

Det. Callaghan's testimony concerning seeing Hoffman with this firearm."  (Mot. at 53-54.)

Hoffman further argues that had trial counsel "properly familiarized himself with petitioner

Hoffman's discovery and the facts of his case, he would have been able to argue that the .22

handgun was inadmissible."  (Id.)  Hoffman, however, fails to offer any plausible argument as to

why the gun should not have been admitted into evidence, and why trial counsel was ineffective

in failing to keep it out.

The testimony at trial, on the other hand, does establish that this gun was properly

admitted into evidence.  For example, Officer John Kemp, a Camden Police Officer, testified that

on the night of January 20, 2001, he stopped a car driven by Hoffman as it ran a red light.  When

Hoffman's vehicle was stopped, he put a spotlight on the vehicle and noticed Hoffman making

suspicious movements in the car.  By speaker from his patrol car, Officer Kemp told Hoffman to

put his window down and put both hands on the steering wheel.  Hoffman failed to do so, and

was ordered out of the vehicle.  When he did so, Hoffman became "rambunctious."  Officer

Kemp then patted Hoffman down and felt something in his left pocket.  Hoffman then began to

resist and he was handcuffed.  Officer Kemp then observed that the object that he took from

Hoffman's pocket was a box of hollow point bullets.  After securing Hoffman in his patrol car,

he looked in the area where Hoffman had been putting his hands and found the gun in question.

20

It was located in the "console in arms' reach over by the right seating between the driver's seat and the passenger's seat."  (N.T. Oct. 8, 2003 at 76-83.)  Thus, because the gun was clearly admissible evidence, trial counsel could not have been "deficient" in his performance under Strickland's first prong for not further investigating the gun.

Hoffman also argues under this ineffective assistance claim that trial counsel was ineffective for failing to investigate the handcuffs that were used during the commission of the crimes.  Again, it is difficult to interpret exactly what Hoffman is arguing, but he seems to be claiming that he never possessed nor purchased a set of toy handcuffs from a place called the Maryland House on I-95 while riding up from Washington, D.C. with Oliver.  Hoffman asserts that had trial counsel investigated the handcuffs, he would have found witnesses that would have verified that Oliver falsely testified that Hoffman purchased the handcuffs while he was riding with him.  (Mot. at 61.)

In support of his claim, Hoffman cites testimony of Oliver from the 2005 trial of McGahee where Oliver testified that the handcuffs were purchased at the Maryland House.  (Id. at 63.)  However, Oliver never testified as to where the handcuffs were purchased back in 2003 at Hoffman's trial.  Thus, Hoffman's instant claim fails because it was impossible for trial counsel to have known this information at the time of Hoffman's trial in 2003 to impeach Oliver's testimony on this issue.[19]

_____

[19]As with Hoffman's ineffective assistance claim regarding failure to investigate inmate witnesses, Tyler and Gagliardi, even if this claim were presented as one of newly discovered evidence, it would fail, nonetheless, because this testimony is nothing more than impeachment evidence rather than evidence of innocence.  See Kelly, 539 F.3d at 181-82.

**7.  Failure to Argue that the Alleged Crimes Did Not Affect Interstate Commerce**

Hoffman next asserts that trial counsel was ineffective for failing to move for judgment of acquittal based on the Government's failure to prove the element that the robbery he allegedly committed affected interstate commerce in some way.  (Mot. at 78-79.)  Hoffman also argues that trial counsel was ineffective for neglecting to argue to the jury that the Government failed to prove the effect on the interstate commerce element, and failing to object to a jury instruction concerning the interstate commerce element.  (Id.)

As noted above, Hoffman was convicted of conspiracy to commit robbery affecting interstate commerce, in violation of the Hobbs Act, 18 U.S.C. § 1951.[20]  The issue of whether the Government failed to prove that Hoffman's activities affected interstate commerce was already addressed by the Court of Appeals on direct appeal in this case.  See United States v. Hoffman, 148 Fed. Appx. at 128.  The court held that:

> Interference with a drug dealer's business has been held to violate the Hobbs Act because of the interstate character of drug dealing.  United States v. Cox, 942 F.2d 1282, 1286 (8th Cir. 1991).  Accordingly, a conspiracy to rob drug traffickers may affect interstate commerce.  See United States v. Clausen, 328 F.3d 708, 711 (3d Cir. 2003) (holding that conviction for Hobbs Act robbery is constitutional so long as it has de minimis impact on interstate commerce); United States v. Jones, 30 F.3d

---

[20]The Hobbs Act provides that:

> [W]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined . . . or imprisoned . . . or both.

18 U.S.C. § 1951(a).

> 276, 285 (2d Cir. 1994) (holding that robbery of proceeds intended for
> purchase of cocaine affected interstate commerce).  Therefore, we will
> affirm the conviction for conspiracy to commit a Hobbs Act robbery."

Id.  Accordingly, trial counsel's actions in not motioning for a new trial based on this issue, not

arguing it to the jury, and not objecting to a jury charge concerning this crime cannot be deemed

"deficient" under Strickland's first prong.

### 8.  Failure to Impeach Detective Callaghan and Gary Oliver

Hoffman argues that trial counsel was ineffective for failing to impeach Detective

Callaghan with prior testimony.  Hoffman argues that:

> The prosecutor and the police through Officer Callaghan provided
> dishonest testimony in regard to their petition for the second superseding
> indictment.  This perjury, had Mr. Restrepo done his job, should have been
> a basis to have both the superseding indictment denied and the basis for
> impeaching the case agent and his foundational testimony on the question
> of conspiracy.  Without this manufactured testimony there would have
> been no evidence of a conspiracy.

(Mot. at 65.)  Hoffman spends several pages of his Motion discussing the supposed inconsistency

of Alejandro Rivera, and whether, at the time of the Second Superceding Indictment, the

Government had just recently learned of his involvement with the Rosado drug organization.

(Mot. at 65-67.)  However, Hoffman wholly fails to explain how trial counsel could have

impeached Detective Callaghan on this issue when it was not raised in direct examination.

Moreover, Hoffman fails to offer any rationale as to how any such impeachment would have

made any difference in the outcome of his trial.  As discussed above, to establish prejudice under

Strickland's second prong, Hoffman must show that counsel's errors were so serious as to

deprive him of a fair trial.  Id. at 694.  In order to do so, a petitioner must establish a reasonable

probability that but for counsel's errors, the result of the trial would have been different.  Id. Hoffman has failed to establish such, and thus, this claim fails.

Hoffman also argues that trial counsel should have impeached Oliver concerning the robbery of Hoffman's home in Virginia.[21]  Hoffman asserts that the Government offered evidence of the robbery to show motive on his part to rob the people who had robbed him, but Oliver's testimony refutes that argument because Oliver testified that Hoffman did not believe that "people from Philadelphia" had robbed him.[22]  (Mot. at 67-70.)  Hoffman's argument is, however, baseless because the record is clear that the Government never argued at Hoffman's trial that the robbery of Rosado was revenge for him robbing Hoffman's house in Virginia. Rather, the Government argued that Hoffman had been robbed and wanted to make up for losing what was stolen by robbing someone else, so he planned to travel north and rob Rosado of his drugs and money.  In fact, the Government argued to the jury in closing that:

> Gary Oliver told you that [Hoffman's] wife and son had been
> robbed down in Virginia, and that he wanted to come up and rob

---

[21]Hoffman now asserts that his house was, in fact, never robbed.  (Mot. at 68.)

[22]Oliver did testify that Hoffman did not believe it was the "people from Philadelphia" who robbed his home.  He stated:

> Q.  Try again?  Okay.  You already mentioned to us in your
> testimony that Moh [Hoffman] told you his wife and son had been
> robbed in Virginia?
> A.  Yes.
> Q.  Did he mention to you who did that robbery?
> A.  He said he had an idea of who did the robbery.
> Q.  Okay.  It was not the people from Philadelphia?
> A.  No, it was not.

(N.T. Oct. 9, 2003 at 9:14-21.)

> these people up in Philly.  Not the ones that had robbed him down
> there, but others that had money, and he wanted to rob them, so he,
> too, could eat, eat, have more money, have more drugs.

(N.T. Oct. 10, 2003 at 100.)  Thus, because the Government made Oliver's testimony clear to the

jury, clarifying that Hoffman did not rob Rosado out of revenge for robbing his own home, this

claim is meritless.  In addition, because Oliver never testified that Hoffman believed the robber

of his home to be Rosado, trial counsel had nothing to impeach Oliver regarding this issue.

### 9.  Failure to Raise Vouching Objections

Hoffman claims that the prosecutor repeatedly vouched for Government witnesses during

her closing, and that trial counsel was ineffective for failing to object.  Vouching constitutes an

assurance by the prosecuting attorney of the credibility of a government witness through personal

knowledge or by other information outside of the testimony before the jury.  United States v.

Lawn, 355 U.S. 339, 359 n.15 (1958).  A prosecutor's vouching for the credibility of a

government witness raises two concerns:  (1) such comments can convey the impression that

evidence not presented to the jury, but known to the prosecutor, supports the charges against the

defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the

evidence presented to the jury; and (2) the prosecutor's opinion carries with it the imprimatur of

the government and may induce the jury to trust the government's judgment rather than its own

view of the evidence.  United States v. Young, 470 U.S. 1, 18 (1985); United States v. Walker,

155 F.3d 180, 184 (3d Cir. 1998).

According to the Third Circuit, in order to establish that a prosecutor's remarks constitute

improper vouching, "two criteria must be met:  (1) the prosecutor must assure the jury that the

testimony of a government witness is credible; and (2) this assurance is based on either the

prosecutor's personal knowledge, or other information not contained in the record." Kindler v.

Horn, 542 F.3d 70, 87 (3d Cir. 2008) (Walker, 155 F.3d at 187). "The defendant must be able to

identify as the basis for [the prosecutor's comment on witness credibility] explicit or implicit

reference to either the personal knowledge of the prosecuting attorney or information not

contained in the record." United States v. Brennan, 326 F.3d 176, 183 (3d Cir. 2003) (quoting

Walker, 155 F.3d at 187).

Hoffman has cited in his Motion a number of instances in the prosecutor's closing that he

alleges is improper vouching. First, Hoffman claims that the prosecutor vouched for

Government witness, Boyce, by stating that: "And I suggest to you ladies and gentlemen, that no

one has that good a memory that they could memorize that from reading documents." (N.T. Oct.

9, 2003 at 102.) However, this statement does not constitute vouching because the prosecutor

never told the jury that Boyce was credible because of personal knowledge or outside evidence,

but rather, because of his memory of the events.

Next, Hoffman alleges that the prosecutor vouched for Government witness, Oliver, in

the following statement in her closing:

> But what happened?  On January 20th, Moh [Hoffman] decided he
> wanted to eat, I think, the words were that Gary Oliver testified to.
> Gary Oliver told you that [Hoffman's] wife and son had been
> robbed down in Virginia, and that he wanted to come to up and rob
> these people up in Philly.  Not the same ones that had robbed him
> down there, but others that had money, and he wanted to rob them,
> so he, too, could eat, eat, have more money, have more drugs.

(Id. at 100.)  This statement, however, is clearly not vouching because it does not make

26

assurances that Oliver's testimony was credible.

Hoffman also asserts that the prosecutor improperly vouched for Government witnesses when she stated in her closing:

> But you would have to believe, let's see, the Philaddelphia Police Department, the Bensalem Police Department, the Camden Police Department, the DEA, Gary Oliver, Juan Rosado, David Vazquez, Arthur Boyce, Dunning and perhaps even AT&T Wireless Cell, all got together to put all of this together. Use your common sense. Or does it make sense what the evidence shows you, that it was the defendant who did these crimes charged.

(Id. at 138:3-10.)  Again, the prosecutor never claims that these witnesses are trustworthy based on personal knowledge or other evidence not contained in the record as is required under Walker. At most, the prosecutor suggested to the jury that to believe Hoffman's innocence one would have to believe that all these Government witnesses conspired to lie and frame Hoffman.  In addition, the prosecutor clearly tells the jury in this statement to do what the "evidence shows you."[23]  (Id. at 138:9.)  Accordingly, trial counsel cannot be ineffective for failing to object to proper closing remarks by the prosecutor.

### 10.  Failure to Raise an Apprendi Issue

Hoffman next contends that trial counsel and sentencing counsel were ineffective for failing to raise an Apprendi issue.  In Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), the Supreme Court held that "other than the fact of a prior conviction, any fact that increases the

---

[23]Hoffman also makes a confusing assertion in his Motion that Detective Callaghan improperly vouched for cooperating Government witnesses.  However, Hoffman has failed to identify where this occurred, or any place in the record where Detective Callaghan made an assurance for witnesses based on personal knowledge or evidence not in the record.

penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."

The basis for Hoffman's claim apparently is the Court's instruction to the jury that cocaine and heroin are controlled substances.  (Mot. at 107.)  However, instructing the jury that the drugs involved were controlled substances is not a fact that increased the statutory maximum penalty.  Thus, there was no Apprendi violation here, and counsel certainly cannot be ineffective for failing to raise such an issue.

### 11.  Failure to Raise Conflict of Interest on Appeal

Hoffman claims that his first trial counsel, Thompson, had an "irreconcilable conflict of interest" with Government witness Boyce because he represented Hoffman and Boyce at the same time.  (Mot. at 84-85.)  Hoffman now asserts that his appellate counsel[24] was ineffective for failing to raise this conflict of interest.[25]  The record, however, demonstrates that there was no conflict of interest that prejudiced Hoffman in any way.

Thompson became Hoffman's attorney in October 2001, and was Hoffman's counsel at his first trial which took place on February 25-26, 2002.  As noted earlier, that trial ended in a mistrial, and Boyce did not testify.  Thompson was permitted to withdraw as Hoffman's counsel

---

[24]Although the Strickland test was initially formulated in the context of trial counsel's stewardship, it applies with equal force to our analysis of Hoffman's challenge to the performance of appellate counsel.  See Diggs, 833 F.2d at 444-45.

[25]Hoffman attempted to raise this claim on appeal from the denial of his Motion for a New Trial.  The Court of Appeals, however, refused to hear this claim and found this claim waived because Hoffman should have raised it earlier in his direct appeal.  Hoffman, 271 Fed. Appx. at 228.

on June 23, 2003, and this Court appointed Restrepo to represent Hoffman.  Boyce testified at

Hoffman's second trial which began on October 6, 2003, and was cross-examined by Restrepo.

(N.T. Oct. 10, 2003 at 3-6, 17-18.)  Thompson did become Boyce's attorney on May 8, 2002,

after the first Hoffman trial, but later withdrew as Boyce's counsel on June 5, 2003.

As is apparent from the above sequence of events, there was no conflict with Thompson

representing Hoffman and Boyce because Thompson did not become Boyce's attorney until after

Hoffman's first trial.  In addition, Hoffman's first trial ended in a mistrial before Boyce could

testify.  Thus, Hoffman was not prejudiced by Thompson representing both him and Boyce for a

short period of time.  Therefore, appellate counsel certainly could not be ineffective for failing to

raise a meritless issue on appeal.[26]

### 12.  Failure to Litigate a Batson Claim

Hoffman next claims that appellate counsel was ineffective for not appealing a

peremptory strike under Batson v. Kentucky, 476 U.S. 79 (1986).  The Court in Batson held that

the discriminatory use of peremptory challenges during jury selection in a defendant's trial

violates equal protection.  Id. at 89-93.  The Court established a three-part burden shifting

framework to guide a trial court's constitutional review of peremptory strikes:

> First, a defendant must make a prima facie showing that a peremptory
> challenge has been exercised on the basis of race.  Second, if that showing
> has been made, the prosecution must offer a race-neutral basis for striking
> the juror in question.  Third, . . . the trial court must determine whether the
> defendant has shown purposeful discrimination.

---

[26]Nor is there any indication in the record of prejudice to Hoffman during the period that
Thompson represented both Hoffman and Boyce.

Miller-El v. Cockrell, 537 U.S. 322, 328-29 (2003).

Hoffman claims that the Government excluded an African-American juror solely based on race, and offers as proof the following exchange between the Court, trial counsel, and the prosecutor:

> Mr. Restrepo:  I was going over this with my client and he's asked me to come to sidebar with respect to government challenge number four.
>
> Ms. Gabbreilli:  Which is what number?
>
> Mr. Restrepo:  Seat number seven, juror number 62, she's an African-American female.  It was seat number seven juror number 62, she's an African-American female and I guess the essence of what Mr. Hoffman has asked me to relate to the court is asking for a Batson type explanation.
>
> Ms. Gabbreilli:  Your honor, I decided to use my peremptory on this juror because she had her arms folded and was scowling more in the direction of the government than in the defense counsel but was scowling nonetheless and also not paying attention at times when your honor was giving instruction to the juror.
>
> Mr. Restrepo:  I would defer to the Court's judgment on this.
>
> The Court:  I find that the government has explained a non-race based reason for the challenge.  Overrule your objection but the objection's on the record.

(N.T. Oct. 6, 2003 at 57.)

"[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  Purkett v. Elem, 514 U.S. 765, 768 (1995).  Here, Hoffman has certainly not met that burden.  As the record demonstrates, the prosecutor gave a race-neutral explanation as to why she struck this juror.  Hoffman has made no showing that this explanation was pretextual, and the Court properly determined that the juror's exclusion was not based on race.  Thus, because this claim has no merit, appellate counsel cannot be deemed

ineffective for not raising this claim on appeal.

### 13. Ineffectiveness During Sentencing and Failure to Raise Sentencing Issues on Appeal

Lastly, Hoffman sets forth a rambling and confusing assertion that sentencing counsel was ineffective during his sentencing, and in failing to raise sentencing issues on appeal of the sentencing. (Mot. at 104-109.) Hoffman states:

> Mr. McMahon was constitutionally ineffective in failing to raise at sentencing and on appeal sentencing issues that may have resulted in a lower sentencing for Petitioner. Despite Petitioner's many please [sic], McMahon failed to raise sentencing issues as directed by Petitioner even after he adoting [sic] Petitioner's Pro se Sentencing Memorandum. Petitioner Hoffman's sentence should be vacated for resentencing because Mr. McMahon was ineffective and because the district court improperly increased Petitioner's offense level based on the conduct of his alleged co-conspirators before his alleged involvement in the conspiracy. The court made inaccurate factual findings and relied on those findings in giving Petitioner such a severe sentence. Finally, the court failed to adequately assess the Petitioner, not just the offense, and refused to fashion its sentence to reflect Petitioner claims of prosecutorial misconduct. Had these factors been given fair consideration, a lesser sentence would have been omposed [sic].

(Id. at 105.)

These sentencing complaints against the Court and sentencing counsel, or claims very similar to these complaints, have already been raised and litigated before the Third Circuit. See Hoffman, 271 Fed. Appx. at 227. For example, in denying Hoffman's sentencing claims, the Third Circuit held that this Court properly declined to hear evidence concerning the weight of the drugs, and that "Hoffman's attempted play of the prosecutorial misconduct card at resentencing" was baseless. (Id. at 230.) As is apparent here, Hoffman has couched as ineffective counsel

claims a number of sentencing claims that were already rejected by the Third Circuit on appeal. However, because these claims were determined to be without merit, appellate counsel cannot be ineffective for failing to raise them as ineffective counsel claims.  Finally, this Court's <u>Booker</u> resentencing of Hoffman provided him with ample opportunity to advocate for a reduced sentence, and this Court did, in fact, impose a lower sentence from life imprisonment to a thirty-year imprisonment.

An appropriate Order follows.