IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MARCELLAS HOFFMAN,<br><br>               Defendant. | CRIMINAL ACTION<br>NO. 01-169 |

**OPINION**

**Slomsky, J.**                                                                                                                                                                                **July 6, 2021**

### I.    INTRODUCTION

Pro se Defendant Marcellas Hoffman ("Defendant"), who is serving a 450-month sentence, moves to modify his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), the compassionate release statute. (Doc. No. 321.) In his Motion (Doc. No. 321), Defendant requests "that he be released and granted Compassionate Release." (Id. at 16.) He argues that the Court should grant his Motion because the conditions at his detention center and his underlying health place him at an increased risk of harm from the COVID-19 pandemic. (See id. at 4-6.) Defendant also contends that his release would be consistent with the 18 U.S.C. § 3553(a) sentencing factors because he has rehabilitated himself during his incarceration. (See id. at 14.)

The Government opposes Defendant's Motion, citing the severity of Defendant's underlying offenses and his disciplinary record while incarcerated, his ability to manage his medical condition while incarcerated, his service of less than half of his sentence, and the numerous measures the Bureau of Prisons ("BOP") has implemented to prevent the spread of COVID-19 in its facilities. (See Doc. No. 333 at 11-25.) For reasons that follow, Defendant's Motion (Doc. No. 321) will be denied.

1

## II. BACKGROUND

### A. Defendant's Criminal History

Defendant is presently incarcerated for conspiring to commit armed robbery during a drug trafficking crime. (See Doc. No. 333 at 6.) In affirming his conviction on appeal, the Third Circuit Court of Appeals summarized the "pertinent facts" of Defendant's case:

> Juan Rosado ran a multi-million dollar drug organization distributing cocaine and heroin in Philadelphia and the surrounding areas. Hoffman was one of Rosado's distributors. Hoffman began purchasing heroin and cocaine from Rosado in the summer of 2000. At the first drug sale, Hoffman bought 250 grams of cocaine for $7,000, paying cash for half the drugs and taking the other half on consignment. A few days later Hoffman told Rosado that he had "finished with the drugs" and that he wished to purchase more. At this second meeting Hoffman brought the $3,500 due for the drugs he had purchased on consignment and an additional $7,000 to buy more drugs. At a later meeting, Hoffman informed Rosado that "he could get rid of a truckload of drugs in Virginia and that he just needed somebody that could supply him with good quantities and good price." Hoffman thereafter bought narcotics from Rosado on many occasions for sale in Virginia.
>
> In early 2001, Hoffman decided to rob Rosado and enlisted the help of a former co-worker, Gary Oliver. Hoffman telephoned Rosado and told him that he was coming to Philadelphia with $30,000 to purchase 500 grams of heroin and a kilogram of cocaine. Oliver testified that on the morning of January 20, 2001, he drove to Hoffman's house to pick him up and that when Hoffman came out of his house he was carrying a "bag with a couple of handguns in it and one of the butts of the guns was hanging out." The two men then drove to Camden, New Jersey where they met Hoffman's cousin [Gary McGahee].[1] The three men then drove to meet Rosado at Porky's Point restaurant.
>
> Rosado picked up 390 grams of heroin for Hoffman, but not the cocaine requested because he had decided he was not ready "to do any more business with [Hoffman]." Rosado decided to meet Hoffman at 5911 Frontenac Street, Rosado's stash house. That evening, Rosado put the heroin in his truck and drove with his wife and mother-in-law to the Frontenac Street house. He sent David Vasquez, one of his employees, to meet Hoffman at Porky's Point and bring him back to the Frontenac Street house.
>
> Vasquez did so and told Hoffman, Oliver, and [McGahee] to follow him to Frontenac Street. After arriving there, Hoffman gave one gun to Oliver, one to [McGahee], and kept one for himself. Hoffman and Oliver followed Vasquez into

---

[1] In its opinion, the Third Circuit referred to McGahee by his alternative name "Casbah."

the house while [McGahee] waited outside. Rosado had not yet arrived. Once inside, Hoffman gave Vasquez only $16,000, not the agreed upon $30,000. After Vasquez demanded the remaining $14,000, Hoffman and Oliver pointed their guns at Vasquez, and Hoffman handcuffed him and demanded to know where the drugs and money were located. Vasquez answered that Rosado was bringing the drugs, and he was then thrown on the floor and pistol whipped by Hoffman, who shot him in the leg.

When Rosado arrived, he met Hoffman and they went to the second floor where Hoffman pointed a gun at Rosado, showed him a badge, told him he was under arrest and handcuffed him. Hoffman then demanded the drugs. Rosado told him the drugs were in the truck and that he would get them. Before they went to the truck, Hoffman searched Rosado and took $1,000 in cash, his credit cards, and his license. At some point during this time Hoffman also took 800–900 grams of cocaine from the kitchen.

After exiting the Frontenac Street house, Hoffman placed Rosado in his truck with [McGahee] and walked towards Rosado's truck. Rosado freed himself, jumped out of Hoffman's truck, and ran towards his own truck. Hoffman chased Rosado and fired at him, hitting him once in the buttocks and grazing his leg. Rosado's wife began driving the truck towards the two men. Hoffman shot at the truck but ran out of bullets. Rosado then jumped into the truck and drove away, but Rosado's wife noted the license plate number of Hoffman's truck.

A short time later, Rosado's truck was pulled over by police. Rosado informed the police he had been the victim of a shooting and his wife gave the police Hoffman's license plate number. Based on information received from Rosado, the police then searched the Frontenac Street house, where they discovered Vasquez and Oliver, whom they detained, and recovered drugs, drug paraphernalia, and a loaded firearm.

That evening, a police officer observed Hoffman's truck run a red light in Camden, New Jersey. The officer pulled Hoffman over and, as he approached, observed Hoffman "making all kind[s] of movements in the vehicle." The officer ordered Hoffman to place his hands on the wheel, but Hoffman failed to comply. The officer then asked for Hoffman's documentation. Hoffman responded that he had left the documents at a friend's house. The officer ordered Hoffman to exit the car. The officer testified that Hoffman became "rambunctious" and began to "push off." The officer then conducted a pat down and felt something in Hoffman's upper left-hand pocket. The officer shined his flashlight into the pocket and was able to see it was a box of hollow-point ammunition. After securing Hoffman and [McGahee], who was in the truck, the officer performed an inventory search of the truck and found a loaded gun and several credit cards in the name of Roberto Roman, the alias used by Rosado. The officer took Hoffman into custody. He later posted bail and was released.

3

> On January 25, 2001, the officer who had arrested Hoffman learned that there may have been an outstanding warrant for Hoffman or his vehicle. The officer went to the address Hoffman had given him and observed Hoffman on the street. When Hoffman saw the police he started to run but was caught and arrested. A federal warrant was issued for Hoffman on February 1, 2001, and he was transferred from state to federal custody on April 30, 2001. He was arraigned on May 7, 2001.
>
> Hoffman's trial began on February 25, 2002. Prior to trial, the District Court had ruled that the government could not introduce evidence of Hoffman's prior drug dealings with Rosado. Nevertheless, on the second day of trial, the government elicited testimony from which the jury could infer that Hoffman and Rosado had had prior drug dealings. As a result, the District Court granted a mistrial. Before the case was retired, Hoffman moved to dismiss the indictment on double jeopardy grounds. The District Court denied that motion and we affirmed on November 26, 2002. The mandate was not issued until January 23, 2003.

United States v. Hoffman, 148 F. App'x 122, 124-26 (3d Cir. 2005) (second and seventh alterations in original) (citations omitted).

On March 6, 2003, a federal grand jury returned a Second Superseding Indictment against Defendant charging him in six Counts with:

1. Conspiracy to distribute heroin and cocaine, in violation of 21 U.S.C. § 846 (Count One);

2. Attempt to possess with intent to distribute heroin, in violation of 21 U.S.C. § 846 (Count Two);

3. Using and carrying three firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Three);

4. Conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count Four);

5. Using and carrying three firearms during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Five); and

6. Being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (Count Six).

(See Doc. No. 333 at 6.) Defendant was convicted on all six Counts and sentenced to life imprisonment. (See id. at 6-7.)

After his sentencing, Defendant appealed, arguing his sentence was unconstitutional in light of the United States Supreme Court decision in United States v. Booker, which severed United States Sentencing Guidelines' provisions from mandatory application. See Hoffman, 148 F. App'x at 126; see also United States v. Booker, 543 U.S. 220, 258 (2005). Although the Third Circuit affirmed Defendant's convictions, it agreed that he should be resentenced in light of Booker. See Hoffman, 148 F. App'x at 130-31. Thereafter, Defendant was resentenced to a total term of sixty-five years' imprisonment, including a twenty-five-year sentence on Count Five to run consecutive with all other Counts, followed by nineteen years' supervised release. (See Doc. No. 333 at 7-8.)

Later on, the Third Circuit Court of Appeals granted Defendant authorization to file a second or successive 28 U.S.C. § 2255 motion to challenge his § 924(c) conviction on Count Five in accordance with the United States Supreme Court decision in United States v. Davis. See 139 S. Ct. 2319, 2336 (2019) (holding "crime of violence" language in 18 U.S.C. § 924(c)(3)(B) unconstitutionally vague).[2] The Government did not oppose Defendant's Motion, and on March

---

[2] 18 U.S.C. § 924(c) "authorizes heightened criminal penalties for using or carrying a firearm . . . 'in furtherance of,' any federal 'crime of violence or drug trafficking crime.'" United States v. Davis, 139 S. Ct. 2319, 2324 (2019) (quoting 18 U.S.C. § 924(c)). Section 924(c)(3) contains two definitions of a "crime of violence." See § 924(c)(3). Section 924(c)(3)(B) defines "crime of violence" as "an offense that is a felony and . . . that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." § 924(c)(3)(B). However, in Davis, the Supreme Court held that Section 924(c)(3)(B)'s "crime of violence" definition is unconstitutionally vague. See Davis, 139 S. Ct. at 2336. The practical import of Davis is that courts are now tasked with determining whether a prior conviction falls within the "crime of violence" definition in § 924(c)(3)(A): "an offense that is a felony and . . . has as an element the use,

5

4, 2020, the Court vacated Defendant's judgment on Count Five. (See Doc. Nos. 304-305.) On June 17, 2021, the Court resentence Defendant to a total term of 450 months' imprisonment, followed by eight years' supervised release. (See Doc. Nos. 353; 354 at 3-4.)

Presently, Defendant has served approximately 20 years of his sentence. (See Doc. No. 333 at 9.) He was serving his sentence at United States Penitentiary, Lee ("USP Lee") in Lee County, Virginia, but he has been transferred to the Federal Detention Center, Philadelphia ("FDC Philadelphia") for his resentencing. (See id. at 9.) According to the Government, while incarcerated, Defendant has committed nineteen disciplinary infractions, which include possession of heroin, a dangerous weapon, a hazardous tool (three times), alcohol, and unauthorized items (three times). (See id. at 10.)

Aside from his present offenses, Defendant has an extensive criminal history. He has three prior felony drug trafficking convictions, an armed robbery conviction and four juvenile convictions. (See id. at 9.) He committed the offenses that resulted in his present incarceration while on parole in the Commonwealth of Virginia. (See id.)

### B. Defendant's Pro Se Motion for Compassionate Release

On March 30, 2020, while incarcerated at USP Lee, Defendant sent a request for compassionate release to the Warden at USP Lee. (See id. at 11.) On April 18, 2020, the Warden

---

attempted use, or threatened use of physical force against the person or property of another . . . ." § 924(c)(3)(A).

Regarding Defendant Hoffman, he and the Government "agree[d] that [Defendant]'s conviction" under § 924(c) "is unconstitutional because the predicate offense—conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951—is not categorically a crime of violence after Davis." (Doc. No. 304 ¶ 4.) Thus, the Government did not oppose the Court granting Defendant relief under 28 U.S.C. § 2255 regarding his § 924(c) conviction, and he has been resentenced on his remaining convictions, as noted infra. (See id. ¶ 5; Doc. No. 305.)

denied his request. (See id.) Thereafter, on December 10, 2020, Defendant filed the instant pro se Motion for Compassionate Release, requesting "that he be released and granted Compassionate Release." (Doc. No. 321 at 16.)

In his Motion, Defendant contends that his Type II diabetes, high cholesterol, blood clots, obesity, hip enthesopathy,[3] flat footedness, hyperlipidemia, myositis,[4] and kidney damage create a "danger to [his] health" if he were to contract COVID-19. (Id. at 6; see also id. at 4.) He argues that, in light of the COVID-19 pandemic, his medical condition and the conditions at FDC Philadelphia are extraordinary and compelling reasons to warrant his release. (See id. at 6.) Further, Defendant claims that a modification of his sentence is consistent with the 18 U.S.C. § 3553(a) sentencing factors because he has rehabilitated himself while incarcerated by participating in over twenty programs. (See id. at 14.) Additionally, on December 23, 2020, Defendant sent a letter to the Court stating that he contracted COVID-19 and was placed in quarantine. (See Doc. No. 322 at 1.)

On February 5, 2021, the Government filed a Response to Defendant's Motion. (Doc. No. 333.) In its Response, the Government argues that Defendant's high cholesterol, blood clots, hip enthesopathy, flat footedness, hyperlipidemia, myositis, and kidney damage are not extraordinary and compelling reasons for his release because these medical conditions are not COVID-19 risk factors. (See id. at 19-20.) The Government admits that Defendant's Type II diabetes and obesity

---

[3] "Enthesopathy is an umbrella term for conditions" wherein tendons and ligaments "get inflamed and become painful because of injury, overuse, or disease." Enthesopathy and Enthesitis, WEBMD (June 30, 2021), https://www.webmd.com/arthritis/psoriatic-arthritis/enthesitis-enthesopathy.

[4] "Myositis refers to any condition causing inflammation in muscles. Weakness, swelling, and pain are the most common myositis symptoms." Myositis, WEBMD (June 30, 2021), https://www.webmd.com/a-to-z-guides/myositis-symptoms-treatments-prognosis#1.

7

are COVID-19 risk factors and "permit consideration for compassionate release." (Id. at 20.) It contends, however, that his diabetes and obesity "are appropriately managed" at FDC Philadelphia. (Id. at 21.) Further, the Government questioned whether Defendant contracted COVID-19 because he attended a January 4, 2021 video hearing, meaning he was not quarantined as of that date, and appeared asymptomatic. (See id. at 10.) But Defendant's medical records do confirm that he contracted the virus on December 19, 2020. (See Doc. No. 340 at 2.)

The Government also argues that the § 3553(a) sentencing factors do not justify Defendant's compassionate release. (See Doc. No. 333 at 21-22.) In support of this position, it highlights Defendant's violent criminal acts during the commission of his present offenses, his extensive criminal history, and his disciplinary infractions while incarcerated. (See id.) The Government also recounts BOP policies enacted to prevent the spread of COVID-19 and the "extensive mitigation steps" taken at FDC Philadelphia, despite a COVID-19 outbreak there in October 2020. (Id. at 14; see also id. at 11-15.)

Finally, on March 1, 2021, Defendant filed a Reply to the Government's Response in Opposition. (Doc. No. 339.) In his Reply, Defendant affirms his COVID-19 diagnosis with updated medical records and further discusses the implementation of BOP COVID-19 policies at FDC Philadelphia. (See id. at 10-12, 15-27; see also Doc. No. 340 at 2.) Next, he contests the Government's arguments on his nature and history by objecting to any reference to his prior juvenile and adult convictions, disputing the accuracy of his disciplinary infractions during his incarceration, and listing his rehabilitation efforts. (See id. at 3-9, 14, 30-31.) Lastly, he relies on his "serv[ing] [a] substantial amount" of his sentence. (See id. at 33; see also id. at 2.)

## III. DISCUSSION

### A. The Analytical Framework Regarding Motions for Compassionate Release Pursuant to § 3582(c)

Generally, a district court "may not modify a term of imprisonment once it has been imposed . . . ." 18 U.S.C. § 3582(c). There are, however, "a few narrow exceptions" to this general "rule of finality[,]" Freeman v. United States, 564 U.S. 522, 526 (2011), including the compassionate release statute, § 3582(c)(1)(A). As amended by the recently enacted First Step Act, § 3582(c)(1)(A) empowers a district court to modify a term of imprisonment on a defendant's motion after the defendant has exhausted his administrative remedies.[5] See § 3582(c)(1)(A)(i). The statute provides, in part, that a court:

> [M]ay reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [§ 3553(a)] to the extent that they are applicable, if it finds that—

---

[5] A defendant may file a motion for compassionate release directly with a district court after he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . ." 18 U.S.C. § 3582(c)(1)(A); see also United States v. Harris, 973 F.3d 170, 171 (3d Cir. 2020) (holding prisoner need not fully exhaust administrative rights if thirty days pass from warden's receipt of compassionate release request). In other words, before a defendant can make such a request to the court, he "must at least ask the Bureau of Prisons (BOP) to do so on [his] behalf and give [the] BOP thirty days to respond[,]" United States v. Raia, 954 F.3d 594, 595 (3d Cir. 2020), and if the BOP does respond adversely within the thirty days, to then exhaust any available administrative appeals during that period. See § 3582(c)(1)(A).

Here, Defendant has met the exhaustion requirement before filing his Motion. On March 30, 2020, he sent a request for compassionate release to the Warden at USP Lee where he was housed when he made his initial request. (See Doc. No. 333 at 11.) On April 18, 2020, the Warden denied Defendant's request. (See id.) On December 10, 2020, over thirty days after Defendant submitted his initial request, he filed the instant Motion for Compassionate Release. (Doc. No. 321.) Because the Warden at USP Lee received and denied Defendant's request and over 30 days have passed between Defendant's request and the filing of the instant Motion, he has met the exhaustion requirement.

> (i) extraordinary and compelling reasons warrant such a reduction; . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

§ 3582(c)(1)(A). Congress, however, has not defined the term "extraordinary and compelling reasons," except to the extent that "[r]ehabilitation of the defendant alone" is insufficient to constitute an extraordinary and compelling reason. 28 U.S.C. § 994(t). Instead, Congress delegated the authority to define "extraordinary and compelling reasons" to the United States Sentencing Commission. Section 1B1.13 of the Sentencing Guidelines explains that a sentence reduction under § 3582(c)(1)(A) may be ordered where a court determines:

> [A]fter considering the factors set forth in 18 U.S.C. § 3553(a), . . . that—
>
> (1) (A) Extraordinary and compelling reasons warrant the reduction; . . .
>
> (2) the defendant is not a danger to the safety or any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

Application Note 1 to § 1B1.13 discusses the meaning of "extraordinary and compelling reasons," and lists three specific qualifying circumstances: (1) a defendant's medical condition, (2) age, or (3) family circumstances. § 1B1.13, n.1(A)-(C). This Note states:

> Provided the defendant [is not a danger to the safety of any person or to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant
>
> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life

10

trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

 (ii) The defendant is—

  (I) suffering from a serious physical or mental condition,

  (II) suffering from a serious functional or cognitive impairment, or

  (III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. The defendant

 (i) is at least 65 years old;

 (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and

 (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family circumstances.

 (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

 (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

Id. Application Note 1 further provides a "catch-all" provision, which allows a court to modify a sentence for "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in subdivisions (A) through (C)." § 1B1.13 n.1(D).[6]

The Application Notes only provide "helpful guidance" and are "not ultimately conclusive . . . ." United States v. Rodriguez, 451 F. Supp. 3d 392, 398 (E.D. Pa. 2020) (quoting United States v. Fox, No. 14-03, 2019 U.S. Dist. LEXIS 115388, at *5 (D. Me. July 11, 2019)). Since the Sentencing Commission has not yet amended § 1B1.13 or its commentary to account for the First Step Act, a district court has the authority to independently assess whether there are extraordinary and compelling reasons warranting a sentence reduction under § 3582(c)(1)(A). See Rodriguez, 451 F. Supp. 3d at 395.

In general, however, "[i]n the context of the current global pandemic, [c]ourts around the country have [only] granted compassionate release where the defendant suffers from a serious condition that increases the likelihood of severe consequences from COVID-19." United States v. Somerville, 463 F. Supp. 3d 585, 596 (W.D. Pa. 2020) (internal quotation omitted) (quoting United States v. Brooks, No. 07-20047, 2020 U.S. Dist. LEXIS 85671, at *14 (C.D. Ill. May 15, 2020)). In the Third Circuit, this means that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release . . . ." United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020). In addition, "[m]ost, though not all, of the cases where compassionate release has been granted also involved some showing that COVID-19 is actually present, usually to a significant degree, in the facility where the prisoner

---

[6] Although by its express language § 1B1.13 applies to motions brought by the Director of the BOP, the current consensus is that the First Step Act removed this requirement. See generally United States v. Rodriguez, 451 F. Supp. 3d 392, 398 (E.D. Pa. 2020) (considering whether a defendant bringing a direct-to-court motion for compassionate release demonstrated "extraordinary and compelling reasons" and using § 1B1.13 as "helpful guidance.").

12

is incarcerated." Somerville, 463 F. Supp. 3d at 596. Thus, "a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held." Id. at 596-97.

If a district court determines that an extraordinary and compelling reason exists, it must then weigh that reason against the § 3553(a) factors to determine if a sentence reduction is warranted and, if so, the extent of such reduction. See id. at 588 ("[T]he Court must weigh [the] extraordinary circumstances against the ordinary sentencing factors under 18 U.S.C. § 3553(a)."). Section 3553(a) establishes factors for a court to consider in initially imposing a sentence. Not every factor is applicable, however, when considering a motion for compassionate release. In the instant case, the applicable factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]
>
> . . . [and]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

§ 3553(a)(1)-(2), (6). Therefore, if a balance of a defendant's extraordinary and compelling reasons with the § 3553(a) factors support a reduced sentence, and that reduction is consistent with applicable policy statements of the Sentencing Commission, a court may reduce a defendant's prison term, modify the terms of supervised release, or both.

B. **Defendant's Motion for Compassionate Release Will Be Denied**

Defendant's Motion will be denied. First, only Defendant's Type II diabetes and obesity present particularized vulnerability to COVID-19. Although diabetes and obesity are COVID-19 risk factors, they are not extraordinary and compelling reasons warranting Defendant's release because his conditions are appropriately managed while Defendant is incarcerated. Second, the relevant § 3553(a) factors weigh against a reduction or modification of his sentence.[7] Each of these matters is discussed in turn.

1. **Defendant Does Not Show an Extraordinary and Compelling Reason for His Release**

None of Defendant's medical conditions present an extraordinary and compelling reason for his release, even though he has shown that the existence of COVID-19 at FDC Philadelphia is more than merely speculative.[8] In his Motion, Defendant contends that his Type II diabetes, high

---

[7] Because the Court will deny Defendant's Motion for the reasons given, it is not necessary to determine whether a reduction in Defendant's sentence is also consistent with applicable policy statements of the Sentencing Commission.

[8] There is an actual, non-speculative risk of contracting COVID-19 at FDC Philadelphia. The Government concedes that FDC Philadelphia suffered a COVID-19 outbreak in October 2020 that resulted in approximately 240 infections, nearly one-fourth of the entire inmate population. (See Doc. No. 333 at 14.) The Government also notes that, as of the date of the filing of its Response, there were seven reported COVID-19 cases at the detention center. (See id.) The past COVID-19 outbreak and current infections show that a risk of infection is still present at FDC Philadelphia. The Court notes, however, that the BOP has implemented precautions to quarantine infected and symptomatic inmates to contain the virus's spread, including the vaccination of prisoners. (See id. at 11-15.)

14

cholesterol, blood clots, obesity, hip enthesopathy, flat footedness, hyperlipidemia, myositis, and kidney damage create a "danger to [his] health" if he were to contract COVID-19. (Doc. No. 321 at 6; see also id. at 4.) In its Response, the Government notes that only Defendant's Type II diabetes and obesity are COVID-19 risk factors that "permit consideration for compassionate release." (Id. at 20.) It states, however, that his diabetes and obesity are not extraordinary and compelling reasons for Defendant's release because they "are appropriately managed" at FDC Philadelphia. (Doc. No. 333 at 21.) Finally, Defendant provides medical records showing that he tested positive for COVID-19 on December 19, 2020. (See Doc. No. 340 at 2.) The Court will first address Defendant's Type II diabetes and obesity, and it will then discuss Defendant's other medical conditions and COVID-19 diagnosis.

i. **Defendant's Type II Diabetes and Obesity**

First, of Defendant's alleged medical conditions, only Type II diabetes and obesity have been classified by the Centers for Disease Control and Prevention ("CDC") as conditions that can increase the risk of severe illness from COVID-19 infection.[9] See People with Certain Medical Conditions, CENTERS FOR DISEASE AND CONTROL PREVENTION (May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Despite being classified as COVID-19 risk factors, Defendant's diabetes and obesity appear well managed while he is incarcerated. (See Doc. Nos. 333 at 20-21; 334.) Defendant takes Metformin to treat his diabetes and he is only slightly more obese than he was

---

[9] The CDC notes that a Body Mass Index ("BMI") of 30 $kg/m^2$ or greater constitutes obesity and is an actual COVID-19 risk factor. See People with Certain Medical Conditions, CENTERS FOR DISEASE AND CONTROL PREVENTION (May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Defendant is 71 inches tall and weighs 255 pounds. (See Doc. No. 333 at 20.) Based on his height and weight, Defendant's BMI is 35.6 $kg/m^2$, which is above the CDC's obesity threshold. (See id.)

when he committed his crimes. (See Doc. No. 333 at 10.) Moreover, courts have routinely denied compassionate release based on diabetes and obesity alone. See, e.g., United States v. Bermudez, No. 05-044, 2020 WL 7338556, at *5-6 (E.D. Pa. Dec. 14, 2020) (denying compassionate release despite defendant's BMI of 61.9 kg/m$^2$); United States v. Williams, No. 15-471, 2020 WL 4756743, at *5 (E.D. Pa. Aug. 17, 2020) (holding obesity with BMI of 31.5 kg/m$^2$ does not meet extraordinary and compelling reasons for release); United States v. Whiteman, No. 15-298, 2020 WL 4284619, at *1 (E.D. Pa. July 27, 2020) (finding mild obesity and hypertension fall short of extraordinary and compelling reasons for release); United States v. Hodges, No. 14-28, 2020 WL 7047304 (E.D. Tex. Nov. 30, 2020) (holding Type II diabetes did not meet an extraordinary and compelling reason for compassionate release); United States v. Iezzi, No. 17-157, 2020 WL 4726582, at *11 (W.D. Pa. Aug. 4, 2020) (denying compassionate release despite defendant's "very serious" medical conditions that included Type II diabetes). For these reasons, Defendant's Type II diabetes and obesity are not extraordinary and compelling reasons for his release.

### ii. Defendant's Other Medical Conditions and COVID-19 Diagnosis

Next, the CDC has not classified high cholesterol, blood clots, hip enthesopathy, flat footedness, hyperlipidemia, myositis, or kidney damage as COVID-19 risk factors. See People with Certain Medical Conditions, supra. Additionally, Defendant does not show how these conditions would increase his risk of severe illness if he contracted COVID-19, and they appear to be appropriately managed during his incarceration. (See Doc. Nos. 333 at 21; 334.) For these reasons, Defendant's other medical conditions do not present extraordinary and compelling reasons for his release.

Finally, on December 19, 2020, Defendant tested positive for COVID-19. (See Doc. Nos. 322 at 1; 340 at 2.) Despite the positive test, Defendant did not present evidence of a severe

reaction to the disease or how his diagnosis would present an increased risk to him should he be reinfected. Moreover, Defendant does not claim that he suffers from adverse effects from his infection. For these reasons, his alleged COVID-19 diagnosis also does not present an extraordinary and compelling reason for his release.

### 2. The § 3553(a) Sentencing Factors Do Not Weigh in Favor of Defendant's Release

Turning to the § 3553(a) sentencing factors and their application to Defendant, the relevant sentencing factors counsel against Defendant's compassionate release at this time. First, the Court has examined the nature and circumstances of the offense and Defendant's history and characteristics. See § 3553(a)(1). Defendant has a history of committing violent drug and robbery offenses. Presently, he is incarcerated for conspiring to commit drug crimes and robbery while armed. See Hoffman, 148 F. App'x at 124-25. Defendant shot two individuals during the commission of the offenses. See id. at 125. In addition, he has three prior felony convictions for drug trafficking crimes and armed robbery. (See Doc. No. 333 at 9.) Most tellingly, his criminal history did not deter him from engaging in the drug and robbery crimes for which he is presently incarcerated, which he committed while on parole in the Commonwealth of Virginia. (See id.) Moreover, although his positive rehabilitation efforts while incarcerated are commendable,[10] given his criminal history, there is no assurance that Defendant would be deterred from committing additional crimes if released.[11] In sum, he is still a danger to the community.

---

[10] (See Doc. No. 339 at 8-9.)

[11] The Government also notes that Defendant has nineteen disciplinary infractions during his incarceration, which include possession of heroin, a dangerous weapon, a hazardous tool (three times), alcohol, and unauthorized items (three times). (See Doc. No. 333 at 10.) In his Reply, Defendant contests the accuracy of these infractions. (See Doc. No. 339 at 4-7.) Because of this dispute, the Court will not consider Defendant's alleged infraction history in deciding his Motion for Compassionate Release.

Second, the Court has also considered whether Defendant's release would reflect the seriousness of the offenses, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes by him. See § 3553(a)(2)(A)-(C). On June 17, 2021, the Court resentenced Defendant to a total term of 450 months' imprisonment. (See Doc. No. 354 at 3.) His new sentence was based in part on the Court's analysis of the § 3553(a) factors, including the purposes listed in § 3553(a)(2). Defendant has served approximately half of his amended sentence,[12] and the magnitude of his crimes and his criminal history warrant the sentence he is serving. (See Doc. No. 333 at 9.) At this time, a reduction in his sentence would not serve any of the above considerations.[13]

Finally, the Court has considered the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. See § 3553(a)(6). Defendant received a sentence below the range set by the Sentencing Guidelines, which Congress created to address sentencing disparities. Based on Defendant's base offense level and criminal history score, the applicable guideline range prescribed a sentence of 480 months to life imprisonment. (See Doc. No. 333 at 9.) At sentencing, however, the Court varied downward and

---

[12] Defendant has served approximately 240 months of his total term of 450 months' imprisonment. (See Doc. Nos. 333 at 9; 354 at 3.)

[13] In United States v. Pawlowski, 967 F.3d 327, 331 (3d Cir. 2020), the Third Circuit held the following regarding 18 U.S.C. § 3582(c)(1)(A) and its requirement that a court reviewing a motion for compassionate release consider the § 3553(a) factors to the extent they are applicable:

> Because a defendant's sentence reflects the sentencing judge's view of the § 3553(a) factors at the time of sentencing, the time remaining in that sentence may—along with the circumstances underlying the motion for compassionate release and the need to avoid unwarranted disparities among similarly situated inmates—inform whether immediate release would be consistent with those factors.

sentenced Defendant to a total term of 450 months' imprisonment.  Any further reduction would not reflect the Sentencing Commission's goal of avoiding unwarranted sentence disparities among similarly situated defendants and ensuring consistent punishment for similar offenses.  Thus, none of the applicable § 3553(a) factors favor Defendant's release.

IV.     CONCLUSION

For the foregoing reasons, Defendant's Motion for Compassionate Release (Doc. No. 321) will be denied.  An appropriate Order follows.